J. F. CHANDLER, *as Administrator of the Estate of Byron E. Dye,* v. MARY I. DYE.

1. DIVORCE — *No Contract for Son's Support.* D. and wife were divorced, and the custody of their minor son was given to the wife, whom she afterward supported. The evidence discussed, and *held,* that there was no sufficient evidence to prove a contract between D. and his divorced wife that he should pay her for such support.

2. REFEREE — *Report, When Set Aside.* Where the report of a referee is not sustained by sufficient evidence, the same should be set aside on motion of the aggrieved party, and a new trial granted.

*Error from Miami District Court.*

THE opinion states the facts. Judgment for plaintiff *Dye,* at the October Term, 1885. The defendant brings the case to this court.

*Thos. M. Carroll,* for plaintiff in error.

*Brayman & Sheldon,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This action was originally commenced on October 18, 1884, in the probate court of Miami county, by Mary I. Dye, by filing an account for $3,166 against the es-

tate of Byron E. Dye, her former husband, for the support, education and maintenance of their minor son, Robert C. Dye. The administrator, J. F. Chandler, filed a motion requiring her to itemize her account, which motion was sustained, and on November 11, 1884, an amended statement, containing the various items of her account, amounting to $3,628.50, was filed. Afterward a trial was had before the probate court, and the claim disallowed on the authority of *Harris v. Harris*, 5 Kas. 46. An appeal was then taken by Mary I. Dye to the district court, and on February 2, 1885, she filed her first amended petition. To this petition a demurrer was interposed, which was sustained by the court on the authority of *Harris v. Harris*, supra. Having failed to establish her *account* as a claim against the estate of her former husband, she then, with leave of the court, and on March 24, 1885, filed her second amended petition. In this petition, and for the first time, she set up *a contract* between herself and Byron E. Dye, under which contract, she alleged, he was to pay her for the support, education and maintenance of their minor son. By the consent of the parties, and the order of the court, the cause was then referred to a referee for trial, and on June 18, 1885, a trial was had before the referee. The referee found that there was such a contract as was alleged in the plaintiff's petition, and found that the sum of $2,747.50 was a reasonable sum for the support, education and maintenance of said minor son, and that Mary I. Dye was entitled to a judgment for this amount against the estate of Byron E. Dye. A motion to set aside the referee's report on various grounds, and also a motion for a new trial on the ground of newly-discovered evidence, were filed by the defendant, and overruled by the court, and the defendant then brought the case to this court for review. All the evidence heard on the trial before the referee is preserved in the case, and brought to this court.

The only question presented to this court is, whether the evidence establishes a contract between Byron E. Dye and the plaintiff, whereby he agreed to pay her for the support, education and maintenance of their minor child. The facts in

this case, stated in brief, are substantially as follows: Byron E. Dye and Mary I. Dye were married on May 14, 1855, and were divorced on June 16, 1877, by a decree of the circuit court of Jackson county, Missouri. During their marriage they had two children — one a girl, Frankie Dye, and the other a boy, Robert C. Dye, aged respectively at the date of the divorce, about 18 and 8 years. The father supported and maintained the daughter. The court granting the divorce gave the custody and control of the minor son to the mother. In November following the granting of the divorce, Mary I. Dye left Kansas City, Missouri, and removed to Chicago, Illinois, taking with her their minor son, Robert, where they have since resided. Byron E. Dye continued to reside in Kansas City until March, 1881, having about that time married again, when he with his wife removed to Miami county, Kansas, where they continued to reside up to the date of his death, which occurred on September 26, 1883. At the time of the divorce, June 16, 1877, the wealth of Byron E. Dye was variously estimated at from $40,000 up to $50,000; his most intimate business acquaintances placing it at about $45,000. By the decree of divorce, Mary I. Dye received of this amount $5,000 as alimony. This is all that she was shown to have received, until after the trial, when it was shown on the hearing of the motion for a new trial, that by an amicable arrangement between herself and Dye, she in fact received, in all, about $16,000. Mrs. Dye could not testify in this case in her own behalf with respect to any transaction or communication had personally between herself and Byron E. Dye, which occurred before the divorce was granted. (Civil Code, §§ 322, 323.) But with respect to all other matters, and all matters occurring since the divorce, she was as competent to testify as any other person. About the only evidence in the case tending to show that any contract was ever made between Byron E. Dye and Mrs. Dye for the support, education and maintenance of their minor son, is the following.

Mrs. Rilla Webster testified with respect to a conversation had between herself and Mr. and Mrs. Dye, on the day that,

but before, the divorce was granted, among other things as follows:

"I started to leave the room, when Byron called me back and said, 'I wish you to hear what I have to say.' He then said, 'he would have to support Robert anyway.' This was said by him in connection with what he had been saying about the amount he would give his wife, Mary I. Dye. He seemed to be defending himself on account of the small amount he was giving Mrs. Dye."

John F. Gregory, a cousin to Byron E. Dye, testified among other things as follows:

"I was intimately acquainted with Byron E. Dye during his lifetime. I had several conversations with him in relation to his boy, Robert, since he (Dye) and Mary I. Dye were divorced. He said he had Robert to support, and also that he had his daughter, Frankie, to support. This conversation was after he was married to his second wife, Augusta Kreinhop, and before his daughter was married. At another conversation, about a year afterward, he spoke in relation to the support of his children. He seemed to speak as though the support of his daughter was costing him too much money. He said it was better for Robert to be with his mother, for he did not want the care of him; that it would cost him less for his mother to take care of him."

On February 29, 1880, Byron E. Dye wrote a letter to Mrs. Dye, which contains, among other things, the following:

"Mary, I have made arrangements with Willoughby, Hill & Co., clothiers, corner Clark and Madison, to furnish Robert his clothes on my credit. . . . I know you do not want to ask me for the money for his clothes, and I cannot tell when he needs them, nor how much to send; and furthermore, I neglect it when I am not where he is. I hope to be in a position, when he becomes of the proper age, to give him such education as his tastes and future prospects in life will require. I am highly pleased with his progress. . . . While I do not want to be extravagant, I want him to look nice."

On December 12, 1880, Byron E. Dye wrote a letter to his son, which contains, among other things, the following:

"I hope you will write me a letter at least once a month, and not wait until you want some more clothing."

H. H. Grimshaw testified with regard to a conversation had between himself and Byron E. Dye, in 1880, or in 1881, as follows : "He said he had a boy to support, who was at school." On April 20, 1882, Byron E. Dye wrote a letter to his son, which contains, among other things, the following:

"DEAR ROBBIE : Yours of the 22d duly received. Come as soon as you want to. If your mother will advance your ticket and expenses, I will send it to her as soon as I am able to go to town and get a draft."

On April 30, 1883, Byron E. Dye wrote a letter to Mrs. Dye, which contained, among other things, the following:

"Mary, I wish you would ask your lawyer if your custody of Robert, according to the decree of divorce, affects his heir-ship to my estate."

After the divorce, and up to the time of the death of Byron E. Dye, he furnished clothing, and money for clothing, to his son to the amount of $184. The evidence tending to show that there was no contract between Byron E. Dye and Mrs. Dye that he should pay her for the support, education, and maintenance of their minor son is as follows. Mrs. Dye testified on the trial, among other things, as follows:

"I always kept a watch and oversight over Mr. Dye, even after he left my house. I kept no rigid account of my bills, no separate account for the boy, no separate account for board. For nearly two years I paid $10 per week for board, and I count it from that. *I made up the account about the time I brought in my bill.* I never asked Mr. Dye for any pay, so I kept no account; but, as stated before, only since I was appointed guardian. I counted from the last year. I only know in a general way that I paid $130 per year for his clothing, and from the frequency of his having to have a new suit of clothes; never asked for any that I did not get. I may have asked for the clothes. Mr. Dye furnished clothes whenever he wished for it; laundry expenses I paid. It is an estimated account. I never asked Mr. Dye to pay any laundry bill. The doctor's bill — I paid it. I brought it up to last year in my account. I never gave the boy less than 25 cents per week; kept no separate account. When he wanted a book I bought it and paid for it; was charged to nobody. I esti-

mated same as I did the other accounts. I never made out any bills before. . . . The relation between us from the time of the divorce up to the time of his death was a business relation. · *Mr. Dye assisted me up to the time of his death.* I can't say that I asked his advice. He offered to reloan the money for me. No; he never demanded the child, but at times felt bitter about it. Frankie's father supported her. . . . The divorce was granted owing to his fault. *Judge, I had no notion to charge until he refused to accept a compromise we had come to.* I accepted the pittance that was offered me. I expected to live until he had used up all his property. I expected the father would take care of all his family as long as he was able. So long as Byron lived we would have had what was just. . . . The conversation spoken of by Mrs. Webster took place in the forenoon. *Nothing was said about the support of the child between me and Mr. Dye.* It would be impossible for me to state everything which occurred, owing to the effect upon my mind. Nothing more was said about the divorce, as I can remember. *He expected me to withdraw the suit.*"

On December 25, 1879, Robert C. Dye wrote a letter to his father, which contains, among other things, the following : "*I thank you for the present.* I think I will buy myself a suit of clothes with the money."

On January 14, 1880, Robert C. Dye wrote a letter to his father, which contains, among other things, the following: "I thank you for the money; ·I can buy myself a nice suit of clothes with it." On June 17, 1880, Byron E. Dye wrote a letter to Mrs. Dye with reference to purchasing clothing for Robert at the clothing house of Willoughby, Hill & Co., which letter contains, among other things, the following: "If they object, have Frankie pay for them out of my money she has on hand for fence." On the same day Byron E. Dye wrote a letter to his son, which contains, among other things, the following: "You can go to Willoughby, Hill & Co., and get your clothes. I will write your mother in regard to it." On December 1, 1880, Byron E. Dye wrote a letter to his son, which contains, among other things, the following: "I send you a draft for $20. I want you to get a nice suit, and then I want you to keep it nice." On December 17, 1880, Robert

C. Dye wrote a letter to his father, which contains, among other things, the following:

"I received your letter from Frankie, with many thanks. I will give you an account of what I bought with my money. It was as follows."

And then follows an itemized statement of the clothes bought for $20, together with a statement that his mother was pleased with his clothes.

On November 17, 1882, Byron E. Dye wrote a letter to his daughter Frankie, which contains among other things, the following:

"Suppose I die soon, all I have except Gussie's dower goes to you and Rob. You would not see your mother want. If I live and she should unfortunately lose her money, does anybody think I would ever see her want? I would divide my last dollar with her. I regard my obligations to support her during life just the same as if no divorce had ever been granted."

Other letters passed between the father and son, of like character to those above quoted.

The burden of proof in this case rested upon the plaintiff, Mrs. Dye, and we do not think that she made out her case. She did not, by the evidence or otherwise, show that any contract ever existed between herself and Byron E. Dye, requiring him to pay her for the support, education or maintenance of Robert C. Dye. Mrs. Dye virtually testified on the trial that no such contract was ever made. And further: The divorce was granted on June 16, 1877; Byron E. Dye died September 26, 1883; and yet no claim was ever made by her to him that he was liable or in duty bound to pay her for anything furnished by her to Robert C. Dye; nor was any such claim ever made against his estate until October 18, 1884, when for the first time she made such claim in the probate court. And no claim was ever made that any contract ever existed between Mrs. Dye and Byron E. Dye imposing any obligation upon him to pay her for anything furnished by her to Robert C. Dye until March 24, 1885, when for the first time she made such claim

<small>1. Divorce — no contract for son's support.</small>

by setting it up in her second amended petition.    And further: Mrs. Dye never kept any account of her expenses in supporting, educating or maintaining Robert C. Dye, and made no charge for any such things as against anybody until she filed her claim in the probate court on October 18, 1884.    What Mrs. Webster heard Byron E. Dye say on the day the divorce was granted, was not said to Mrs. Dye, and in all probability she did not hear it, and of course what was said to Mrs. Webster, whether in the presence or absence of Mrs. Dye, could not constitute a contract between Byron E. Dye and Mrs. Dye.    The clothing and the money for clothing furnished by Byron E. Dye to his son Robert, were evidently furnished as presents, and were not furnished in fulfillment of any contract. The son so considered them, and it would be natural that the father should make presents to his son.    Besides, it would be bad policy to hold that a father could not give his son a present without becoming liable to pay his divorced wife, the son's mother, for everything which she might furnish to the son. Nothing that was said by Byron E. Dye to Mr. Gregory or to Mr. Grimshaw would constitute a contract between Byron E. Dye and Mrs. Dye.    Indeed, it is evident from the evidence in the case, that no such contract ever existed.

We think there was not sufficient evidence to sustain the report of the referee, and therefore the judgment of the court below will be reversed, and the cause remanded for a new trial.

2. Referee—report, when set aside.

All the Justices concurring.